**In re Joseph T. DAVIS, Jr., and Linda H. Davis, Debtors.**

**Charles W. MANEVAL and Elizabeth V. Maneval, Plaintiffs,**

v.

**Joseph T. DAVIS, Jr., and Linda H. Davis, Defendants.**

**Bankruptcy No. 92–32995–S. Adv. No. 92–3146–S.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

May 26, 1993.

---

Robert A. Lefkowitz, Maloney, Yeatts & Barr, Richmond, VA, for plaintiffs.

David D. Lentz, Midlothian, VA, for defendants.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes before the Court on a complaint to determine dischargeability of a debt under §§ 523(a)(2)(A), (a)(4), (a)(6), of the Bankruptcy Code, 11 U.S.C. § 101 et seq., filed September 21, 1992. The defendants filed an answer and counterclaim on October 21, 1992. This Court dismissed the defendants' counterclaim by order entered November 3, 1992. The plaintiffs filed a motion for summary judgment on January 15, 1993, which the Court took under advisement after a hearing held January 27, 1993. The Court held a bench trial on February 2, 1993, at which the Court took evidence and heard argument of counsel. Counsel submitted post-trial briefs, along with which the defendants filed a motion on March 12, 1993, under Federal Rule of Bankruptcy Procedure 7015 to amend their answer to conform to the evidence presented at trial. Counsel argued the defendants' motion to amend the answer on March 29, 1993. This Court has jurisdiction to determine the dischargeability of the debt set forth in the complaint pursuant to 28 U.S.C. §§ 157, 1334, and 11 U.S.C. § 523. Having considered all these proceedings, this Court reaches the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On June 20, 1984, Joseph T. and Linda H. Davis, Jr., the debtors, created L.P.R., Ltd. ("L.P.R.") to manufacture and distribute weather-proof newspaper delivery boxes. See Plaintiff's Exhibit G: Articles of Incorporation. The Davises traded all their right, title, and interest in the development of the product to L.P.R. in exchange for 100% (5,000 shares) of the stock of the corporation. Joseph Davis, the Chairman, Director and President, was issued 4,725 shares. Linda Davis, the Secretary–Treasurer, was issued 750 shares. See Plaintiff's Exhibits M and Q: Minutes of Board of Directors' Meeting of L.P.R., Ltd., and Stock Restriction Agreement, both dated June 29, 1984.

On July 30, 1984, Joseph T. Davis, Jr. ("Davis") entered into a stock subscription agreement with Charles W. Maneval and Elizabeth V. Maneval ("Manevals"), wherein Davis, as Incorporator of L.P.R., agreed

to allow the Manevals to buy fifty shares of stock, representing one percent of the total capital stock of the corporation, for the purchase price of $5,000. The Manevals contend that Davis never told them they were buying his personal shares, but rather led them to believe they were buying treasury stock. The Manevals point to the Stock Restriction Agreement and the Minutes of the Board of Directors' Meeting, executed one month before the stock sale, as proof that Davis knew he was not selling treasury stock. *See* Plaintiff's Exhibits M and Q. They also contend they were never told that Davis planned to finance L.P.R. with loans to the company from the proceeds of the sale of his personal shares, nor that Davis planned to put some of the proceeds from the sale of his shares to his own personal use. The Manevals allege that they were led to believe that their investment would be used to purchase assets for L.P.R., but instead the Davises, who the Manevals contend had no other source of income, used the stock sale proceeds to take personal vacations, purchase luxury items and pay their daily living expenses. The Manevals also allege that Davis falsely represented that he had a patent on the invention, and had they known the truth they never would have invested. The plaintiffs do not allege that Linda H. Davis sold them any of her stock. The Manevals seek to have their investment declared a nondischargeable debt procured by fraud, embezzlement, or conversion. 11 U.S.C. § 523(a)(2), (4), (6).

Davis contends it was his intention and that he advised the Manevals that he was selling Davis' personal shares and not newly issued treasury stock. Davis testified that he told the Manevals he had a *patentable* product, not a patent on the product. Davis states that he never intended to defraud the Manevals nor to embezzle or convert their money. The Manevals wrote their $5,000 check payable to "Joe Davis, Jr." individually, not to L.P.R. or to Davis as agent of the corporation. L.P.R. issued a stock certificate to the Manevals on November 6, 1984, however, the stock certificate book indicates that L.P.R. transferred Davis' stock to the Manevals on July 30, 1984. Davis testified that he spent the money from the sale of his stock on out-of-town trips to the patent office in Washington, D.C., to research the patentability of the box, on legal fees necessary for incorporation, and on expenses of meetings with potential manufacturers. This Court heard inconclusive evidence as to whether the Davises used funds from the proceeds of the sale of their stock for their own personal benefit or rather loaned the money to the corporation to pay expenses of developing the project.

As a backdrop to this adversary proceeding, the Court notes that the Davises and the Manevals were once next-door neighbors in a rural residential subdivision in Powhatan County, Virginia. At one point they were also good friends. Davis had developed what he considered a patentable weatherproof newspaper box and intended to manufacture and sell these boxes to consumers in rural areas whose newspaper is delivered to the road end of the driveway rather than the front door or porch. At the outset of this venture, the Manevals and the Davises discussed and prepared rosy projections of the success of L.P.R. As the corporate endeavor foundered, however, enthusiasm soon led to discontent and acrimony. The Manevals became suspicious of the Davises' "lavish" lifestyle, as they thought the Davises had no other visible means of support.

They both became belligerent and litigious. Mr. Maneval wrote to Mr. Zoeckler of the State Corporation Commission of Virginia ("SCC") as early as March 12, 1986, to complain that the Davises had transferred to themselves one hundred percent of the capital stock of the corporation without consideration and that they then sold shares of stock to other people, keeping all monies for themselves. Defendants' Exhibit N. The Court notes with interest Mr. Maneval's twelve-page letter to the SCC dated May 12, 1986, in which Maneval detailed Davis' alleged fraudulent acts. Manevals' description of the facts relating to the purchase of stock only takes up three sentences in the second paragraph, which reads as follows:

During the month of July 1984 while talking to my neighbor Mr. Joe Davis he mentioned that he had an invention and that he had formed a corporation to make and sell said item. I expressed an interest in this and we talked about this a number of times at my house. On July 30th of 1984, my wife and I purchased 1 percent of L.P.R. or 50 shares for $5,000.00.

Defendants' Exhibit O: Letter from Maneval to SCC, second full paragraph. The balance of the letter relates to events occurring after the sale and are not relevant to the issues in this proceeding.

The Davises then filed a suit in Powhatan County, Virginia, against the Manevals for trespassing upon their property. The court fined the Manevals and enjoined them from trespassing or placing their lawn furniture on the Davises' land. The Manevals retaliated later that year when they and other stockholders brought an accounting action in the Circuit Court of Powhatan County against the Davises and L.P.R. to ascertain the financial condition of L.P.R. This Court has no evidence as to the disposition of the accounting action. In June 1987, a grand jury in Powhatan County indicted Davis in a criminal action for the sale of fifty shares of stock to the Manevals in violation of §§ 13.1–507 and 13.1–520(a), as well as §§ 13.1–504 and 13.1–502(2) of securities laws of the Code of Virginia ("Va.Code"). This criminal action was ultimately dismissed. During this time, probably upon the suggestion in the Maneval's letter, *supra*, the SCC subpoenaed the books and records of the corporation for the purpose of conducting an investigation pursuant to provision of Va.Code § 13.1–518. The evidence shows that the state court criminal proceedings in Powhatan delayed the SCC action until 1988. *See* Defendant's Exhibit K: Letter from Davises' attorney to SCC dated November 20, 1987.

On August 14, 1987, probably as a result of the SCC investigation, counsel for Davis sent to the Manevals a follow-up letter referencing and renewing an offer originally made at the May 28, 1986, stockholders meeting to refund the initial investment plus reasonable interest in exchange for the return of the corporate stock. The August 14 letter included a check from the Davises' attorney's escrow account in the amount of $5,974.68, payable to the Manevals, representing the refund of the initial $5,000 investment, plus interest at the rate of six percent from the date of the initial investment (July 30, 1984) through August 20, 1987. A subsequent letter from counsel for Davis dated September 16, 1987, extended the offer until September 22 to allow the Manevals to negotiate the check and surrender the stock certificate. The Manevals refused the offer. They never cashed the check nor returned their stock certificate to Davis.

More than a year later and as a result of the SCC investigation, L.P.R. and Davis, without admitting or denying the allegations of the commission, consented to the entry of an SCC order accepting settlement, dated December 21, 1988, which required Davis to make an offer in writing to rescind the sale of the L.P.R. stock. If L.P.R.'s investors accepted the offer, Davis was to make restitution of the investment plus six percent interest within forty-five days, the same offer he had made at the stockholders' meeting on May 28, 1986, and repeatedly offered to the Manevals. In spite of this agreement, neither the corporation nor Davis, for economic reasons, were able to comply with the order accepting settlement.

For failure to comply with the order accepting settlement, the SCC ordered Davis to appear before the commission to show cause why he should not be permanently enjoined under Va.Code § 13.1–519 from violating Virginia Code §§ 13.1–502 and 13.1–507 and penalized pursuant to § 13.1–521 on account of the violations of §§ 13.1–502, 13.1–507, and 13.1–521. Davis appeared without counsel when this matter was heard on May 23, 1990, and the commission made the following findings:

(1) That Joseph T. Davis, Jr., is the president and a director of L.P.R., Ltd. ("L.P.R."), a Virginia corporation;

(2) That L.P.R. was incorporated for the primary purpose of engaging in the

business of manufacturing and distributing weather-free paper boxes;

(3) That in or about June 1984, Mr. Davis subscribed to and obtained 81% (4,250 shares) of the authorized common stock of L.P.R. in consideration of all of Mr. Davis' rights, title, and interests in the design and creation of the weather-free paper boxes;

(4) That in or about June 1984, Linda H. Davis, the wife of Joseph T. Davis, Jr., subscribed to and obtained 19% (750 shares) of the authorized common stock of L.P.R. in consideration of all of Mrs. Davis' rights, title and interests in the design and creation of the weather-free paper boxes;

(5) That the stock restriction agreement pertaining to L.P.R. common stock obligates Joseph T. Davis, Jr., and Linda H. Davis to sell as many of their shares of stock as necessary to pay the indebtedness of L.P.R. and to allow L.P.R. to have operating capital until such time that L.P.R. can function and operate on profits derived from the sale of the product;

(6) That the shares of L.P.R. are securities for purposes of the Virginia Securities Act;

(7) That the shares of L.P.R. are not and never have been registered under the securities registration provisions of the Virginia Securities Act;

(8) That between July 1984 and March 1987, Mr. Davis sold a portion of his shares of stock of L.P.R. to at least five investors in five separate transactions;

(9) That Mr. Davis failed to inform the purchasers that he intended to use a portion of their investments to pay his (Davis') personal living expenses and that he intended to finance L.P.R.'s expenses by loaning it money;

(10) That the conduct related in paragraph (9) above resulted in an omission of material facts in four of the five sales of securities;

(11) That Mr. Davis failed to comply with the terms of this Commission's Order Accepting Settlement dated December 21, 1988;

(12) That the aforesaid activities constitute five violations of Virginia Code § 13.1–507, four violations of Virginia Code § 13.1–502 [1], and one violation of Virginia Code § 13.1–521; and

(13) That Joseph T. Davis, Jr., should be enjoined from committing such acts in the future and should be penalized $500 per violation on account of having committed such acts.

After making those findings, the Corporation Commission entered its order as follows:

(1) That pursuant to Virginia Code § 13.1–519, Joseph T. Davis, Jr., be and hereby is, permanently enjoined from directly or indirectly offering or selling any security in violation of Virginia Code § 13.1–502 or § 13.1–507;

(2) That pursuant to Virginia Code § 13.1–521, Joseph T. Davis, Jr., be, and hereby is, penalized in the amount of five thousand dollars ($5,000) and that the Commonwealth recover of and from the defendant said amount; and

(3) That as there appears nothing further to be done in this proceeding, this case be dismissed from the docket and

---

**1.** Virginia Code § 13.1–502 states what Virginia securities law considers unlawful offers or sales practices:

It shall be unlawful for any person in the offer or sale of any securities, directly or indirectly,

(1) to employ any device, scheme or artifice to defraud, or

(2) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) To engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser. (1956, c. 428.)

Va.Code § 13.1–502 (Repl.Vol.1989). The SCC found L.P.R. and Davis liable for conduct resulting in an omission of material fact. *See supra* Plaintiffs' Exhibit C–5: SCC Final Order and Judgment at ¶¶ 9, 10; Va.Code § 13.1–502(2). This Court notes that the SCC did not find Davis liable for employing a device, scheme or artifice to defraud or operating a fraud or deceit upon the purchaser. *See* Va.Code § 13.1–502(1) and (3).

the papers be placed in the file for ended causes.

Plaintiffs' Exhibit C–5: SCC Final Order and Judgment.

The SCC findings indicate that in each of the five transactions Davis failed to register his L.P.R. shares pursuant to § 13.1–507 of the Virginia Securities Act, for which the SCC fined Davis $500 for each act. However, a statutory violation of Va. Code § 13.1–507 need not involve fraud.[2] The SCC found that in only four of the five transactions did Davis fail to inform the purchasers that he intended to use a portion of their investment to pay his personal living expenses and that he intended to finance the corporation's expenses by loaning it money. The SCC found Davis' conduct to result in an omission to state a material fact necessary in order to make the statements that were made not misleading. *See* Va.Code § 13.1–502(2); Plaintiffs' Exhibit C–5 at ¶¶ 9, 10. Finding a violation of Va.Code § 13.1–502(2) does not involve a finding of fraud. This Court notes that the SCC could have found Davis liable for fraud under Va.Code §§ 13.1–502(1) or –502(3) for employing any device, scheme or artifice to defraud or engaging in any transaction which would operate as a fraud or deceit upon the purchaser. *See supra* note 1 (Va.Code § 13.1–502(1), (2)). It appears to this Court that the SCC did not make a finding of fraud on the part of Davis in the sale of L.P.R. securities. Finally, the SCC found that Davis violated Va.Code § 13.1–521 and fined him $500 for failing to comply with the order accepting settlement.[3] A violation of Va.Code § 13.1–521 for failure to comply with the SCC order accepting settlement does not involve a finding of fraud.

Sometime after the SCC Final Order of May 31, 1990, Mr. and Mrs. Maneval and others filed a motion for judgment in the Circuit Court of the County of Chesterfield, Virginia (the "Chesterfield suit"), against Joseph T. Davis, Jr., and Linda H. Davis, with service made on the Secretary of the Commonwealth. The motion for judgment contended that the Davises violated Va. Code § 13.1–522(A) and (B) in fraudulently inducing the investors to invest in L.P.R. and failing to comply with the SCC order to return to the investors the sums paid for stock in the corporation with six percent interest. The Chesterfield County court entered default judgment on September 17, 1990, based upon the defendants' failure to file a responsive pleading within the time prescribed, and rendered judgment against the Davises jointly and severally in the amount of $25,893.14 with interest at eight percent from the date of the judgment, plus attorneys fees in the amount of $5,000 and court costs. The defendants at that time were not living next door to the Manevals and assert they never received service nor were aware of the entry of the order until they filed for bankruptcy.

The record shows that the Manevals knew Davis' alleged fraudulent misconduct of which they now complain when they wrote to the SCC on March 12, 1986. The SCC complaint coincides with the accounting suit and the grand jury indictment in Powhatan County. Despite their suspicions, the Manevals refused to accept the offer to refund the purchase price of their stock made two months later by Davis at the May 28, 1986, shareholders meeting,

---

**2.** Virginia Code § 13.1–507 states the following registration requirement for securities:
> It shall be unlawful for any person to offer or sell any security unless the security is registered under this chapter or the security or transaction is exempted by this chapter.

Va.Code § 13.1–507 (Repl.Vol.1989).

**3.** Virginia Code § 13.1–521 states in pertinent part:
> The Commission may ... if it is proved that the defendant has knowingly made any misrepresentation of a material fact for the purpose of inducing the Commission to take any

action or to refrain from taking any action, *or has violated* any provision of this chapter or *any order of the Commission issued pursuant to this chapter,* impose a penalty not exceeding $5,000....

Va.Code § 13.1–521 (Repl.Vol.1989) (emphasis added). This Court finds that from the SCC order presented in evidence that the SCC did not find that the defendant knowingly made any misrepresentation of a material fact, but rather fined the defendant for failure to abide by the SCC order accepting settlement. *See* Plaintiff's Exhibit C–5, ¶¶ 10, 11.

and again refused to accept another offer contained in Davis' lawyer's letter of August 14, 1987. That letter included the tender of a check on their lawyer's escrow account of the amount of the investment plus six percent interest. Defendant's Exhibit I. Mr. Maneval testified that they did not accept the offer because the Davises appeared successful and they hoped the success of the corporation would make their stock worth more than the return of principal and interest. The success they hoped for never materialized. L.P.R.'s principals, the Davises, are now in bankruptcy. Six years after the Manevals' suspicions of fraud arose, the plaintiffs seek to have the Davises held liable for a nondischargeable debt based on fraud, embezzlement, or conversion. They argue that the SCC order, the Chesterfield County judgment, and the testimony before this Court establish all the elements necessary to prove their claims.

## CONCLUSIONS OF LAW

■ For this Court to determine that the debt is nondischargeable in bankruptcy, the plaintiff must in this instance prove the elements of either 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), or 523(a)(6)[4]. It appears to this Court that it can dispense with the plaintiffs' § 523(a)(4) and (6) claims at the outset. This Court defines embezzlement as "the fraudulent misappropriation of property by a person to whom such property has been entrusted, or whose hands it has lawfully come." *Commonwealth of Virginia Commission of Game and Inland Fisheries v. Myers (In re Myers)*, 52 B.R. 901, 905 (Bankr.E.D.Va. 1985) (interpreting 11 U.S.C. § 524(a)(4)). In the *Myers* case, the debtors sold hunting licenses on behalf of the Commonwealth, but failed to remit the proceeds of the license sales. The Commonwealth sued to have the debt declared nondischargeable on the grounds of embezzlement. This Court held that even where a relationship might imply some form of trust by virtue of a debtor holding funds for another, the debtor's subsequent appropriation of the funds will not amount to embezzlement absent proof of the debtor's fraudulent intent. 52 B.R. 901 (citing *Matter of Storms*, 28 B.R. 761, 765 (Bankr.E.D.N.C.1983)). Fraudulent intent may be negated by the fact that the debtor used such funds openly, without attempting to conceal, and had reasonable grounds to believe he had the right to so use. *Id.* Regardless of who the funds belonged to, the open commingling of the sale proceeds with other funds and the payment of general business debts out of those commingled funds indicates that the debtors had a "reasonable belief" that they had a right to use the funds. 52 B.R. at 905 n. 4. The money at issue in the *Myers* case was not required to be segregated or kept in a separate account, nor was there any restriction as to the use of the proceeds. Money from the sale of licenses went straight into the cash register, from which vendors were paid cash when they delivered inventory. As long as the Commonwealth received a check for the amount due, it did not matter how the funds were maintained. 52 B.R. at 906.

It appears to this Court that the facts of *Myers* are similar to the case at bar. The Manevals imply some form of trust between themselves as investors and Davis as Incorporator. But the facts before this Court belie any intent to embezzle. The Davises used the proceeds of the sale openly, without attempting to conceal their conduct. Maneval wrote his check to "Joe Davis, Jr.," individually, and Davis deposited the check into their personal account, commingling the funds with other personal

---

**4.** The exceptions to discharge statute provides in pertinent part:

    (a) A discharge ... does not discharge an individual debtor from any debt—
        (2) for money ... to the extent obtained by—
           (A) false pretenses, a false representation, or actual fraud ...;
        . . . .

        (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
    . . . .
        (6) for willful and malicious injury by the debtor to another entity or to the property of another entity....
11 U.S.C. § 523(a)(2), (4), (6).

funds. The only restriction on the stock sale proceeds was that Davis must loan money to L.P.R. whenever the corporation needed capital. Davis testified that he spent these commingled funds on general business expenses of L.P.R. and the Court finds that Davis abided by this restriction. Finally, this Court finds that Davis had a reasonable belief that he had a right to use the funds. Davis testified that he sold his personal shares, and he felt the proceeds of the sale of his shares were his own personal property.

■ The actions of the debtor refute any assertion that there was an embezzlement. *See In re Rigsby*, 18 B.R. 518, 521 (Bankr.E.D.Va.1982) (actions of the parties controlled). Davis' unfettered use of the funds indicates a lack of an entrustment agreement or a fraudulent appropriation. The facts show that Davis was lawfully entitled to use the funds. One cannot embezzle one's own property. *Teamsters Local 533 v. Schultz (In re Schultz)*, 46 B.R. 880, 890 (Bankr.D.Nev.1985). This Court finds that Davis did not embezzle Maneval's money.

■ Under § 523(a)(6), the debtors can be held liable for a nondischargeable debt if they commit willful and malicious injury to another by converting their property. 3 L. King *Collier on Bankruptcy*, ¶ 523.-16[1] at 523–112 (15th ed. 1987). In order to establish a claim for conversion, the Manevals must show an act of dominion or control wrongfully asserted over another's property. It is essential that the plaintiff show that the converted item is indeed his property. *Taylor v. Sanders (In re Sanders)*, 105 B.R. 111 (Bankr.M.D.Fla.1989); *Lisk v. Criswell (In re Criswell)*, 52 B.R. 184, 203 (Bankr.E.D.Va.1985); *Metropolitan Hospital v. Hazelwood (In re Hazelwood)*, 43 B.R. 208 (Bankr.E.D.Va.1984). In the *Sanders* case, the plaintiffs wrote a check to a lease brokerage corporation to pay off the purchase option on a car. The corporation commingled the check proceeds with other funds and never paid the lessor for the title. The plaintiffs sued the debtor, owner of the lease brokerage, for con-

version under 11 U.S.C. § 523(a)(6). 105 B.R. at 113.

■ The court in *Sanders* held that once the check was delivered to the corporation, it was no longer the property of the plaintiff and could not be the subject of conversion. *Id.* (citing *Kiernan v. Lambillotte (In re Lambillotte)*, 17 B.R. 256, 258 (Bankr.M.D.Fla.1982) and *In re Criswell*, 52 B.R. at 203). In the case at bar, the Manevals delivered a check to Davis made payable to "Joe Davis, Jr." Davis deposited the check into his personal account and spent the commingled funds on both his personal and L.P.R. expenses. The Manevals received 50 shares of Davis' stock in exchange for their check. Like the plaintiff in *Sanders*, upon delivery of the check to Davis, it was no longer the Manevals' property and could not be the subject of conversion. This Court finds that Davis could not have converted the Manevals' property under 11 U.S.C. § 523(a)(6). Since the money Davis got from the sale of his stock was his own, and Davis could not have fraudulently misappropriated, embezzled, or converted his own funds, the debt cannot be held nondischargeable under 11 U.S.C. §§ 523(a)(4) or (a)(6).

■ Nondischargeability of debt under § 523(a)(2)(A) requires the plaintiff to establish that the debtor made representations, which he knew to be false at the time they were made, with the intent to deceive a creditor who relied on the false representations and which were the proximate result of the loss. *E.g., In re Gadsden*, 128 B.R. 45 (Bankr.E.D.N.Y.1991); *In re Schwartz & Meyers*, 130 B.R. 416 (Bankr. S.D.N.Y.1991). The facts proving these elements must be gleaned either from the SCC proceedings, the default judgment entered in the Circuit Court of Chesterfield County, Virginia, or this adversary proceeding before the bankruptcy court. The record of the proceeding before the SCC resulted in the commission finding that Davis failed to comply with the appropriate registration requirements for issuance of stock in the Commonwealth of Virginia. *See* Va.Code § 13.1–507. The SCC imposed a fine upon Davis for violations of the

registration laws, however, the failure to register securities does not imply fraud in this case.

The commission also found that in four of the five stock sales before the SCC, Davis failed to inform investors that he intended to use part of their investment to pay personal living expenses and that he intended to finance L.P.R.'s expenses by loaning it money. Plaintiff's Exhibit C5, SCC Final Order and Judgment at ¶ 9. The record does not reflect whether Mr. and Mrs. Maneval were one of the four purchasers who were uninformed as to the use of their investment and the manner of L.P.R.'s financing. More significantly, however, nowhere in the record of the SCC deliberations does the commission find that Davis intentionally misinformed the investors with the intent to defraud.

■■■ In SCC deliberations, the intention of the stock seller is not an issue. *Diaz Vicente v. Obenauer*, 736 F.Supp. 679, 694 (E.D.Va.1990). Virginia securities laws impose strict liability on the seller for even innocent violations of the statutes. If the seller violates Va.Code § 13.1–502(2), as the plaintiff here alleges the defendant did, by obtaining money by means of any untrue statement or any omission to state a material fact, then it is the fact of the untrue statement or the omission that establishes liability. The plaintiff need not prove that the seller knew of the untrue statement or omission. *Id.* Section 523(a) of the Bankruptcy Code requires scienter, knowledge and the intent to defraud, on the part of the debtor to find a debt nondischargeable. Since the SCC never considered the issue of intent to defraud, the plaintiff's motion for summary judgment, based on the issue preclusive effect of the SCC proceeding, should be denied. Furthermore, this Court does not find that the facts found in the SCC order to be sufficient badges of fraud from which to infer intent to defraud for the purposes of finding nondischargeability under § 523(a)(2).

Considering the default judgment entered in the Circuit Court of Chesterfield County, Virginia, this Court must note that service was made on the Secretary of the Commonwealth. The state court granted default judgment based upon the defendants' failure to file responsive pleadings within the time prescribed by law. The defendants testified that they had no knowledge of that suit or the judgment. The Davises discovered the judgment upon the filing of their bankruptcy petition and after the time for appeal had expired. The motion for judgment in the Chesterfield suit alleged a violation of the Virginia securities laws. This Court normally inquires into the merits of a suit to determine whether the court in that case made a finding of fraud. However, after the conclusion of the adversary proceeding, the defendant filed a motion to amend his answer under Federal Rule of Bankruptcy Procedure 7015(b) to assert the limitation provision established in the Virginia Code. *See* Va.Code § 13.1–522(D). Rule 7015(b) states that issues tried by implied consent of the parties shall be treated in all respects as if they had been raised in the pleadings. Fed.R.Bank.Pro. 7015(b). This Court finds that all the relevant facts supporting this additional defense were litigated in this adversary proceeding.

The Manevals contend that, even though the statute of limitation may have run, the filing of the bankruptcy petition grants them an independent cause of action arising out of the nondischargeability provisions of the Bankruptcy Code. Maneval argues in essence that upon filing for bankruptcy the debtor risks the revival of an obligation otherwise barred by a statute of limitations. The plaintiff points to § 523, which does not limit dischargeability actions other than to require the complaint be instituted within 60 days following the date set for the meeting of creditors held pursuant to § 341(a). *See* F.R.B.P. 4007(C). For the following reasons, this Court rejects the plaintiffs' argument and finds that the motion to amend should be granted and the answer should be amended to conform to the evidence. *See* Federal Rule of Bankruptcy Procedure 7015(b).

■■ Section 523 contains no statute of limitations. Where the Bankruptcy Code is silent, and no uniform bankruptcy rule is

required, the rights of the parties are governed by the underlying non-bankruptcy law. *Butner v. U.S.,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Klein v. Deicas (In re Deicas),* 137 B.R. 51 (Bankr.S.D.Cal.1992). In the *Deicas* case, the bankruptcy court applied the state statute of limitations to bar a fraud-based dischargeability proceeding. Regarding the case at bar, Virginia Code § 13.1–522(D) precludes a purchaser from maintaining a private right of action under Va.Code §§ 13.1–522(A), (B), (C) if the person liable makes a written offer before suit is brought to refund the consideration paid together with interest at the rate of six percent.[5] If an offer is not made then any suit to enforce liability under § 13.1–522 must be brought within two years after the transaction upon which it is based.

It is clear from the record that the Manevals were offered a refund of their investment with interest as early as a stockholders' meeting in May of 1986, and again in August of 1987. The Manevals chose to reject Davis' offer in hopes the business would succeed. It appears to this Court that, because the stockholders rejected the offer to refund, no private right of action existed to bring the action under Va.Code § 13.1–522 in the Chesterfield County court, but if such a right did exist, it expired two years after the stock sale, prior to the Chesterfield County suit filed six years after the transaction. In view of the lack of service of process in the Chesterfield County lawsuit and the apparent lack of a private right of action for the Manevals to sue on the Virginia securities laws, this Court doubts the validity of the Chesterfield County default judgment. However, this Court bases its decision upon the record of the Chesterfield suit which re-

veals that the issue of fraud, although perhaps alleged in the motion for judgment, was never litigated.

■ Other than the state court order, there exists no record of the proceeding. The default judgment order reflects no findings which would support the allegations of fraud contained in the motion for judgment. Plaintiff's Exhibit D and E. Absent such findings, this Court does not believe that the state court record is sufficient to determine the debt owed to the Manevals to be nondischargeable under § 523(a). However, this Court will not bar a plaintiff who elected certain remedies in bringing a state law claim to judgment from presenting evidence in a dischargeability proceeding to support a contention that the debtor procured the debt through fraud. *See Wood v. Rosner (In re Rosner, M.D.),* Case No. 92–30113–T, Adversary Proceeding No. 92–3063, 1992 WL 471054 (Bankr.E.D.Va. November 15, 1992) (creditor not estopped to present evidence that medical malpractice tort judgment was nondischargeable under § 523(a)(6) willful and malicious exception) (citing *Combs v. Richardson,* 838 F.2d 112, 115 (4th Cir.1988)). For this reason the Court conducted an evidentiary hearing on the Manevals' fraud claims.

■ The Manevals argue that, notwithstanding the SCC Order and Chesterfield suit, the general laws of fraud apply to this adversary proceeding providing the statute of limitations had not expired prior to the filing of bankruptcy. *See* Va.Code § 13.1–522(G) (Repl.Vol.1989). This Court notes that the Manevals waited too long after discovering the fraud to bring a cause of action in state court, the statute of limi-

---

5. The Code of Virginia § 13.1–522 provides a private right of action for plaintiffs to sue on the Virginia securities laws. The limitations provision of this section reads as follows:

D. No suit shall be maintained to enforce any liability created under this section unless brought within two years after the transaction upon which it is based; provided, that, if any person liable by reason of subsection A, B or C of this section makes a written offer, before suit is brought, to refund the consideration paid and any loss due to any investment ad-

vice provided by such person, together with interest thereon at the annual rate of six percent, less the amount of any income received on the security or resulting from such advice, or to pay damages if the purchaser no longer owns the security, no purchaser or user of the investment advisory service shall maintain a suit under this section who has refused or failed to accept such offer within thirty days of its receipt.

Va.Code § 13.1–522(D).

**134**

tations for fraud in Virginia being one year after fraud is discovered. Va.Code § 8.01–248; *United States v. Daves*, 72 B.R. 943 (Bankr.E.D.Va.1987). While it appears to this Court that the Davises might have prevailed on a statute of limitations defense, the failure to affirmatively plead waives the defense. Fed.R.Bankr.Pro. 7008. This matter being a core matter under 28 U.S.C. § 157(b)(2)(I), this Court in addition to the issue of dischargeability may also determine the amount of the indebtedness and the validity of any other defenses to the complaint.

■ The plaintiffs' testimony and the exhibits accepted into evidence in the adversary proceeding in this Court fail to establish Davis' intent to defraud as required by § 523(a)(2). While the stock subscription agreement supports the Manevals' belief that they were being sold treasury stock (Plaintiff's Exhibit A), the Manevals' belief does not confirm Davis' fraudulent intent, for on the other hand, the stub in the stock transfer book (Plaintiffs' Exhibit B–2) indicates a transfer of Davis' personal stock to the Manevals. In fact, the Manevals wrote their check payable to Davis individually, and not to L.P.R.

The Manevals point to the Stock Restriction Agreement and the Minutes of the Board of Directors Meeting of L.P.R., Ltd., executed one month before the sale, as proof that Davis knew the true character of the stock he sold. *See* Plaintiffs' Exhibits Q and M. The Manevals produced an unsigned stock subscription agreement issued to Robert Morris which fully discloses in paragraph three that the stock being sold originally belonged to Davis. Plaintiffs' Exhibit P. The Manevals argue that the agreement which discloses the true character of the stock proves that the Davises intentionally defrauded them into investing by using an agreement which did not disclose Davis' prior stock ownership.

However, the unsigned agreement shows a revision date of March 1986. The plaintiffs do not allege that such a document existed in June of 1984 nor that Davis intentionally failed to use it in their particular transaction two years earlier. This

Court does not find the existence of the March 1986 sale agreement to be a badge of fraud inferring an intent on the Davises' part to defraud the Manevals back in July 1984. As for the July 30, 1984, Stock Subscription Agreement between the Manevals and Davis, this Court does not find that the Manevals have proven that Davis knew that the agreement omitted his intention to use proceeds of the stock sale for personal expenses, and failed to inform them of that fact with the intent to defraud.

With respect to the use of the funds from the proceeds of the sale of the stock, Mr. Maneval testified that Davis used the proceeds to support a high standard of living and pay personal living expense. Davis testified that he paid corporate expenses, including expenses incurred in product development, trips to the patent office to ascertain the patentability of the product, conferences with investors, the cost of incorporation and attorney's fees relating thereto. It is this Court's opinion that the monies realized from the sale of the stock would have been expended in the same manner whether the L.P.R. investors bought corporate stock or reissue stock. This Court does not find Davis' use of the money to be a badge of fraud from which to infer that Davis intended to deceive the Manevals.

Mr. Maneval testified that Davis, at the time of sale, falsely represented that L.P.R. had a patent on the newspaper box, and that their investment would purchase assets for L.P.R. Davis disputes that allegation, saying that he told the Manevals that he was looking to patent the invention, and that he would loan money to L.P.R. The Manevals produced no other evidence that Davis intentionally misrepresented the existence of the patent or the means of L.P.R.'s financing. The evidence before the Court is Maneval's word against Davis'. Both parties could be telling the absolute truth as they know it. In instances of equal weight of the evidence, the Court looks to the burden of proof required to prove nondischargeability. The Supreme Court, in the case of *Grogan v. Garner*, 498 U.S. 279, 289, 111 S.Ct. 654, 661, 112

L.Ed.2d 755 (1991), held that the standard of proof for the dischargeability exceptions under 11 U.S.C. § 523(a) is the preponderance-of-the-evidence standard. The evidence before this Court leads this Court to conclude that the burden of persuasion by a preponderance of the evidence has not been met by the Manevals; no doubt the Davises violated the regulatory statutes of Virginia regarding the sale of stock, but in this instance that does not reach the magnitude of the fraud required here. For the foregoing reasons, it appears to this Court that the Manevals have not proven the nondischargeability of the debt under 11 U.S.C. § 523(a)(2)(A) by a preponderance of the evidence. Additionally, the alleged wrongdoing of Mrs. Davis is not borne out by any adequate showing of fraud at the inception, as she never sold any of her stock to the Manevals.

An order will be entered in conformity with this opinion.